May it please the court. Good morning, your honors. My name is Toby Mock. I'm here on behalf of the plaintiff appellant, Joshua Robert Brown. If it pleases the court, I'd like to reserve three minutes of my time in rebuttal. Okay. The clock counts down, so when it gets to three, that's when you will. Will do. This case is about a constitutionally flawed solitary confinement policy of the Oregon Department of Corrections. Now, this policy, as it was applied to my client, Mr. Brown, in this case, is one that- Well, you know, I'm a little hard of hearing. I'm sorry. So articulate and speak up. Sure. Thank you. So this policy, as it was applied to my client, Mr. Brown, in this case, is one that effectively allows for the indefinite review of inmates in IME without any meaningful periodic review process. Now, until only a few years ago, just prior to when Mr. Brown was first placed in IME, the ODOC policy provided for what were called classification reviews for every inmate housed in IMU. Now, these classification reviews were provided every six months to each of these inmates and evaluated each six months whether there was an ongoing need to indefinitely retain the inmates for an additional six-month period. During Mr. Brown's 27-month retention in IMU, he was not afforded a single one of these classification reviews or anything close to their equivalent. The district judge found, apparently as a matter of fact, that he got a review every 30 days. I expect you to say, but those weren't real reviews. Those were just indications that he'd worked his way through another couple of those darn packets. But let me ask you a different question, which is, I gather he was put in the IMU because he was caught with a weapon, or rather they saw him throw a weapon into an adjoining cell and then they found some of the sandpaper in his cell and so on. Would it have been permissible for the Oregon Department of Corrections to have put him in ADSEG, period, just for 106 months, just as a punishment? It would not. The reason being is that, dating at least to 30 years ago, the Supreme Court in the Hewitt case articulated that there needs to be actual meaningful periodic reviews. So this case is not, in fact, about whether or not Mr. Brown was properly placed in IMU. It's about whether he was afforded the meaningful periodic reviews that the Supreme Court and this Court have required. Even if it was just outright punishment? They just said, listen, you're going to sit in there for 106 months as a punishment for what you did. Why do you have to have periodic reviews if there's a 106-month punishment? Well, I guess the facts here are that Mr. Brown was not placed in this unit as a punishment. He was placed there as a punishment. But that's not the question. Please answer Judge Fletcher's question. That is, could they have put him in ADSEG or some equivalent to IMU simply as punishment? You did this bad thing. You get 106 months. Stay there. They could certainly place him into a solitary confinement housing unit as punishment. And they have a housing unit for that. It's called the DSU. The DSU has a six-month time limitation by which any inmate can't exceed retention. And the reason that is is because this Court and other courts have held that something like a 106-month retention without ongoing meaningful periodic reviews is not constitutionally allowed. Okay. And your answer might also be, well, if they had imposed punishment, this is punishment, this would be a different issue. They didn't impose this punishment. They treated it as if it were some sort of rehabilitation. The stated purpose of the IMU is to effectuate the safe and secure operation of the prison. So the reason that they placed him in there was because they found him with a weapon and they deemed him a security threat. But, again, what the law requires is a periodic review as to whether that security threat is ongoing and exists on a periodic basis. And those reviews simply did not happen in this case. Okay. Mr. Mock, how do you work your way out of IMU? Well, it depends. Basically, when you're placed there, the prison officials have the discretion to assign you what are called these programming packets. Now, they have the discretion to assign you as many of these packets as they want. And, in effect, what is required is that there's a minimum sentence of two weeks for each of these packets. You cannot, by policy, work your way through a single packet in less than two weeks, regardless of your good behavior, et cetera, as Mr. Brown exhibited in this case. So, effectively, they have the discretion when they place you in IMU to give you a minimum sentence that they deem proper without any further review. So how you can work your way through it is, obviously, good behavior and working on your programming packets, but there's a minimum sentence that's applied to every inmate, and that is just based on whatever the Corrections Department deems should be the number of packets that are assigned to a given inmate. And how is it that your client finally worked his way out of IMU? Well, he worked his way through his packets, and, basically, he was progressed through this system. Every two weeks, he moved on to his next packet. And so what it was was a de facto 27-month. He was assigned, I think, 53 packets, so what it was was a de facto 27-month. Is there something infirm in the number of packets that he was assigned? There's no, as far as I know, any logic or rules that govern how many packets are assigned. As far as I can tell, it's just up to the discretion of the prison officials. And he worked his way, finally, through all the packets that he was given as assignments? That's correct. And I guess I assume that along the way, as each one of those packets was either completed or not, somebody was monitoring his progress. Am I right? Actually, that's not true. As it turns out, there was a nine-month gap during Mr. Brown's confinement where the corrections department did not even conduct the 30-day reviews of these packets. They failed to do that, even though the regulations required that those 30-day reviews should have been provided. And why is that? Did you discover why that happened in your handling of this case and its preparation? I don't. We did discover that fact after the district court issued its opinion, which we think was actually not factually true. But we discovered it because, in the record, are a series of these reviews. And there's one each month for the first few months he was in there, but then there's just a complete nine-month gap. I'm slightly confused now. You say that this nine-month gap during which there was no review of the packet progress is something that you discovered after the district court's opinion, which means it's not in the record? No, it is in the record. The actual reviews themselves are in the record. They were in the district court record. The district court, just in reviewing those, it just improperly concluded that the 30-day reviews were provided, but in fact they were not. How do you know they were not? And when did you find that out? Because we have a month-by-month list of the individuals who received these reviews, and there's a nine-month gap where Mr. Brown does not appear on those reviews. And did you explore why, or was this overlooked in the district court? We think it was just overlooked. So we have no idea about what happened? We don't know what happened. Obviously, being at the appellate stage, we haven't conducted any discovery or anything like that to figure out why. Judge Fletcher has a question. I think I'm correct, but I want to make sure I've got it right. Your firm became involved only at the appellate stage? That's correct. And was he pro se entirely in the district court? He was, Your Honor. Okay. You're down to a minute and a half. Let's look on the other side, but we'll make sure to give you a chance to respond. Thank you. Thank you, Your Honors. May it please the Court, Tiffany Keast on behalf of defendants. The district court found that there was no due process violation in this case on the merits. We believe that that was a correct ruling. But I think the real issue here is whether the person defendants are entitled to qualified immunity, even if there was a constitutional violation. Why don't we talk about whether there's a constitutional violation first, and then maybe we can talk about qualified immunity. Sure. So why is there no constitutional violation? There's no constitutional violation because Mr. Brown did not have a liberty interest in being free from housing in the intensive management unit. But isn't the case law that governs here that if somebody's in there not on a fixed term of punishment for some sort of a rehabilitation or changing behavior, that they're entitled to meaningful periodic review? Isn't that the case law? Only if the conditions of that confinement are significant and atypical compared to what the proper comparator housing is. And if I may just briefly segue into qualified immunity, I think why that matters. Well, let's not do that. Let's not segue so quickly. What's the appropriate comparator? You say not the general population? Correct. And on what case do you rely that says that all we look at is ASU and DSU and not the general population? Sure. We know that from Sandin and Wilkinson, which are two Supreme Court cases. Sandin is, at best, is ambiguous on this point, which Wilkinson seems to recognize. But Sandin compared the housing in that case to other forms of segregated housing. And it made mention of general population, but that, I think, didn't undercut the fact that what it considered was actually other segregated forms of housing. And in Wilkinson, the Supreme Court compared the solitary confinement in the Supermax facility to non-Supermax solitary confinement facilities and found that, based on the indefinite duration in the Supermax solitary confinement and the fact that while an inmate was housed there, he was not parole eligible, that those conditions, on top of what would be normal in regular solitary confinement, created a liberty interest in that case. As I read the record, and what I'm hearing today is that Oregon law requires a periodic review of people in the IMU, at least with respect to the packets, to see whether there's progress being made. Is that right? There are. The Oregon Department of Corrections regulations state that an inmate in the IMU is reviewed every 30 days for what's called a programming review. Yes, and now I'm hearing that there's a gap during which there was no review, a violation of Oregon regulations. Your response to that is what? The evidence that was submitted before the district court does show that in the documents that were submitted, there is this nine-month gap where no reviews were provided. Now, I know this may not be in the record, but have you explored the reason why there's that gap? It's not in the record. I don't know why it was. So nobody knows why Oregon rules were not followed? Well, I'm not sure. I wouldn't concede that Oregon rules were not followed because at the time that this gap occurred, my understanding of the record is that Mr. Brown was actually in a different facility, and the state may have just erred in the district court in not gathering the pertinent evidence. So either we just have missing evidence or we do have a gap. But even if we have a gap, it doesn't matter. It doesn't matter, but it may. If it does, why shouldn't we at least remand it for exploration of this problem? For two reasons. First is that the plaintiff has never said that, at least before the district court, the plaintiff, who was pro se at the time, never raised a claim, never said there was any violation with respect to these omitted hearings. So we never have had any sort of claim that that itself was a due process violation. But even if he had, and even if you conclude that he did have a due process right to these programming reviews, there was simply no damages from their omission, because according to Mr. Brown, these reviews were not going to result in his release because this committee didn't have the authority to release him back to general population. He apparently was doing his programming all straight through that period, so the review wouldn't have made any difference. And that omission didn't result in his stay in the intensive management being any longer than it otherwise would have been. But that argument that you just made seems to tell me that no matter what he did, until he finished those 53 packets in the 106 weeks, he was going to be there. Is that right? Yes, that's correct. How can there be any meaningful review during those 106 weeks, then, if he can do nothing to accelerate his progress? Well, if he had, I think that begs the question of whether he had a liberty interest in the first place. I understand. Assume for the moment that he had a liberty interest, and assume for the moment, then, that there has to be some meaningful review. How can there be any meaningful review if what you just told me is true, that there's no feasible way, no possible way, for him to accelerate the progress? He can do one packet every two weeks. He's got 53 packets. At the end of 106 weeks, he can lift his head and say, can I get out now? So how can there be a meaningful review during those 106 weeks if that's true? Well, I agree that in the ODOC regulations, there is not provision for any longer for that type of every six months, periodic classification review that Mr. Brown contends he was entitled to. I think from the state's perspective, the more pressing question is whether there was a liberty interest, and whether that was clearly established. I think I just heard you say, then, that if there is a liberty interest, and if he is entitled to a meaningful review, he didn't get it. I think that's correct. Yes. Okay. Yes. I would acknowledge that. But, again, I think the more pressing point from the state's perspective is the qualified immunity question. Let's stick back on the point that you have not conceded, which is to say there really is no liberty interest that would have triggered the due process protection. As I read Sandin and the other cases, the comparator is the change in status as to the individual prisoner. That is to say that if the prisoner was taken from one status in the prison to another, depending on how severe the new circumstances are by comparison to the prior circumstances, there either is or is not a deprivation of liberty. It's not a comparator. In the abstract, it's a comparator. What was this prisoner's status before, and what's this prisoner's status now? If that's so, I want to ask, then, what was Mr. Brown's status before he was put in the IMU? I believe that before he was put in IMU, which is at the time he was caught with weapons and sent to IMU for his fifth stay there, he was housed in the general population at that time. So if I'm reading the cases correctly, the comparator for him is general population. If that's the correct reading of the cases, that would be correct. I would respectfully argue, however, that that's not the correct reading of the cases. No, I understand your argument. In that Sandin instructs that what you compare to is other discretionary forms of housing and that ASU and DSU, administrative segregation and disciplinary segregation, are the only other forms of discretionary housing in Oregon Department of Corrections structure. What do we know about these packets? I mean, how long would it take a reasonably literate person to read through the packet, for example? I don't believe there's anything in the record about that. I'm sorry, I just don't know. I think the only attack that Mr. Brown has made on the packets is that some of them were not reasonably related to the reason that he was sent to the intensive management unit. Right. And I take that point. He says, well, some of them, for example, were for chocolate addiction, and there's no evidence that he suffered from a chocolate addiction. Exactly. So that has been his only attack on the packets. But I think just to wrap up, I think when we talk about qualified immunity, the right has to be clearly established. So in this case, it needed to be clearly established that there was a liberty interest and that there was, if there was a liberty interest, there was a right to meaningful periodic reviews, whatever that means. Is there any declaratory or prospective injunctive relief that could now be at issue, or is that completely off the table now that he's back in the general population? I think that is off the table, unavailable and unwarranted in that he's not brought this as a class suit, so there's no injunction that could pertain to the other inmates because he hasn't brought claims on behalf of any other inmates. And he is out of IMU now, and whether he goes back is entirely up to him. So injunctive relief or declaratory relief at this point really wouldn't get him anywhere. Are there decisions extant in the district court or otherwise that say there's no liberty interest in what we're talking about? What I would look to would be the Johnson and Rinker decisions. These are both Oregon District Court decisions, one of which was affirmed by this court, and they're Oregon cases involving the IMU decided with ‑‑ may I continue, Your Honor? Oh, please, yes, go ahead. Okay. Decided within just a few years of Mr. Brown's, this instant housing intensive management unit. And in Johnson, this court said, or I'm sorry, the district court said that, actually Rinker, excuse me, the district court said that compared the conditions of IMU to DSU and ASU and found them remarkably similar, consequently not atypical, and that those conditions didn't implicate due process. So we do have a district court opinion involving at least the same agency defendant finding no liberty. So certainly given the case, it would not have been clearly unreasonable for at least the same institutional defendant to conclude that there was no liberty interest in being free from IMU housing. So those are the reasons we think this court can affirm based on immunity. Thank you very much. Any other questions? Okay. Thank you very much. Thank you so much. Mr. Mock, you've saved some time. Thank you. So if I could, maybe I could just address the two cases that Ms. Keys was just discussing that found that the conditions of IMU are not atypical and significant when compared to DSU and ASU. Being Johnson and Rinker? That's correct, yeah. And you'd say, of course, that was about placement, not about continued stay. That is certainly one of my points, but there's even a more pressing point here, and that is those cases each took place before 2008. 2008 was the date when the Oregon Department of Corrections stopped doing these classification reviews for inmates in IMU. Both the plaintiff in Rinker and the Johnson case received six-month classification reviews. The Oregon Department of Corrections argued that those classification reviews are what satisfied due process. So your position is that Hewitt v. Helms wins the day for you in the sense that it was clearly established. Is that right? That's correct. And if you're wrong, you lose. Well, the case is that so the question here, if we're talking about qualified immunity, actually if we could step back is that qualified immunity, which was not an issue addressed by the district court, is not a case dispositive defense as to Mr. Brown's causes of action. It does not attach to the defense does not attach to defendants state officials sued in their official capacities. So it's not a case dispositive defense for one. Well, but if you're suing them in their official capacity, you've got an Eleventh Amendment problem. That's correct, although there's also carve-outs for those, too. Those do not also. So if you're suing in the official capacity, I know you're going over time, but I want to. Sure. We get to talk as long as we want to talk, so don't worry about the time. Assuming you're focusing on official immunity and therefore you're out from under the qualified immunity argument, assuming you're now suing them in their official capacity, how do you get around the Eleventh Amendment? Well, the Eleventh Amendment does not bar claims for injunctive relief. I know. So then my question is going to be, given that he's out of the IMU, how might he be entitled to either declaratory prospective relief or injunctive relief? Well, actually, in our papers, we argued that he would be, and this was not a point that was disputed in the opposition papers. I believe that the fact that he is out of IMU, I don't know that that necessarily removes his standing to seek prospective injunctive relief, because, of course, he's still in prison and he's still potentially subject to being placed in prison. Now, this may take you beyond your briefing. How do you get out from under Lyons v. City of Los Angeles? Do you know the case? I don't. Lyons v. City of Los Angeles, the man is stopped by the LAPD, subjected to a chokehold that he claims is illegal. He brings suit both for damages for the chokehold and for prospective relief. The court allows the suit to go forward with damages but not for prospective relief, saying, well, in order to have the same thing happen to you again, you've got to violate the law again. And that's the point that your adversary just made. It's up to him as to whether or not he goes back in the IMU. If he stays clean, doesn't do any weapons, and so on, he's out. So how do you get out from under Lyons? Well, I don't think it is necessarily up to him whether he is placed there. As counsel argues, IMU is a completely discretionary form of housing. They just get to do it at their whim? It's completely discretionary. They could certainly place him in there if they, for any reason, deemed that he posed a threat to the prison, and they wouldn't have to go through any process. What kind of injunctive or declaratory relief are you asking for? How would we write that? How would a court write that? Well, I think what... If you put him in again, you have to conduct periodic reviews? Well, yes. I think it requires some form... That's a pretty... That's a pretty big if. If he gets placed... I'm sorry. If he were to be placed back in, would it be a big if? Well, in a way, you're going to get the same thing if we were to agree with you as a matter of what constitutional law requires and to disagree with you as to qualified immunity because the court is a perfect... We have our discretion. We could say the Constitution has been violated. The law from here forward is clear. Any future action in violation of what we now write would be... would strip the person of qualified immunity, but on the circumstances of this case, qualified immunity. That, in practical consequence, would give you what you want in the sense of instruction for the future. It would not give you a judgment in your favor, however. Right, and I don't mean to distract, actually, from the merits of the qualified immunity argument because here... The question is whether the contours of the Constitution are clearly defined, and I would argue that they certainly are here. The Supreme Court in the Hewitt case declared that administrative segregation cannot be a basis for indefinite confinement of inmates in solitary confinement and that there has to be... Let me ask you a question about that case. I just grabbed Hewitt. It says they're talking about a liberty interest in a prisoner to remain in the general prison population, not a liberty interest for periodic review once you're in a different unit. Am I right about that? I think that's correct. I'm not sure I followed. So that's a different liberty interest than this one. The liberty interest of being in solitary confinement. To remain in the general population. I'm just reading from the case. That's the same liberty interest that we're discussing here, is Mr. Brown's right to remain in the general population. I think we're talking about the same thing. Well, I'm confused. I thought it was a liberty interest in having periodic reviews of his status in the IMU, which is slightly different. Well, it is certainly... Those would be in the alternative. Either he should be released or... Well, we're talking about clearly established, and we're talking about a different liberty interest. Okay. I think perhaps what would be maybe a case that we could rely on here is the Tucson case, where the Ninth Circuit held that yearly periodic reviews are not sufficient. So if the question is whether a reasonable prison official could think that they could retain Mr. Brown for 27 months, they look no further than the Tucson case, where this court said that you cannot retain an inmate for 12 months without meaningful review. So anybody reading Tucson would understand that in this case they had to provide what you're saying should have been provided? That's correct. And the case is that... Nobody could make... No reasonable person could make a mistake as to what that meant in this situation? Well, I think you could look at that case in conjunction with the cases that the defendants rely on. Because in those cases, the inmate was housed for... Sorry, there's an echo. The inmate was housed for no longer than six months without classification reviews, and the state relied on those classification reviews as satisfying due process. So how could a prison official then think that they could retain an inmate for 27 months without any classification reviews and think that that was constitutionally sanctioned? Okay. Thank both sides for your arguments. And although this signals no view on the merits, I do want to thank you and your firm on behalf of the court for the pro bono representation. We value this greatly in helping us through some of these hard cases. Thank you. Thank you, Your Honor.
judges: Goodwin, Trott, Fletcher